CLERK, U.S BANKRUPTCY COURT
DISTRICT OF OREGON

DEC 1 7 2004

LODGED_____ REC'D_____
PAID_____ BOCKETED_____

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In Re: | ) |
| | ) Bankruptcy Case |
| CLIFFORD HOM CHIN and GAYLE | ) No. 303-40816-rld7 |
| ROBYNE CHIN, | ) |
| | ) |
| Debtors. | ) |
| _____ | ) |
| | ) |
| U.S. TRUSTEE, | ) |
| | ) Adv. Proc. No. 04-3066-rld |
| Plaintiff, | ) |
| | ) MEMORANDUM OPINION |
| v. | ) |
| | ) |
| CLIFFORD HOM CHIN and GAYLE | ) |
| ROBYNE CHIN, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

The United States Trustee's ("UST") adversary Complaint to

deny a discharge to the debtors Clifford Hom Chin and Gayle Robyne

Chin (the "Chins") pursuant to 11 U.S.C. § 727(a)(4)[1] (the

"Adversary Proceeding") was tried on November 22-23, 2004 (the

"Trial"). At the Trial, I also heard the UST's Motion to Dismiss

_____

[1] Hereafter, unless otherwise noted, all statute references
are to the federal Bankruptcy Code, 11 U.S.C. §§ 101 et seq.

Page 1 - MEMORANDUM OPINION

1 | the Chins' chapter 7 case with prejudice (the "Motion to Dismiss"),
2 | filed in the Chins' main case.

3 | Following the Trial, I have reviewed my notes, the exhibits,
4 | the pleadings in the Adversary Proceeding and the parties' other
5 | submissions. I further have reviewed the authorities cited to me by
6 | the parties and other relevant authorities that I have found during
7 | the course of my own research. I have considered carefully the oral
8 | testimony and arguments presented at the Trial, as supported by the
9 | parties' submissions. The following findings of fact and legal
10 | conclusions constitute the court's findings under Federal Rule of
11 | Civil Procedure 52(a), applicable in this combined proceeding under
12 | Federal Rules of Bankruptcy Procedure 7052 and 9014.

13 | <u>Factual Background</u>

14 | This case is before me because Mr. Chin was persuaded to try
15 | his hand at the real estate investment business in late 2001. Prior
16 | to that time, the Chins had purchased a home in 1973 (<u>see</u> Ex.1), but
17 | otherwise had not made any investments in real estate.

18 | For a number of years up to September 2002, Mr. Chin was
19 | employed by a wholesale produce distributorship business, Lucky
20 | Produce, Inc., that he owned with Mr. Richard Ignacio. Lucky
21 | Produce lost a major source of business in 2002 and failed. <u>See</u>
22 | Ex. 2, p. 14. At the time of the Chins' bankruptcy filing, Mr. Chin
23 | was employed by T.P. Produce, Inc. ("TP Produce"). Mr. Chin
24 | testified that he did not have an ownership interest in TP Produce.

25 | Mrs. Chin had done credit collection work for Jantzen,
26 | Columbia Sportswear and AT&T Wireless, in addition to assisting

Page 2 - MEMORANDUM OPINION

Mr. Chin with whatever work needed to be done at Lucky Produce.

In 2001, the Chins refinanced their home and became acquainted with mortgage broker Jeff Johnson. According to Mr. Chin, it was Mr. Johnson who convinced him to enter the real estate investment business, initially through an entity called US Financial Investments LLC ("US Financial"). See Ex. 2, pp. 14-17; Exhibit 3, p. 51. Mr. Chin worked through US Financial to acquire real properties from approximately December 2001 to March 2002. See Ex. 3, p. 51. Later, the Chins worked with C.J. Brigham, who was introduced to them by Jeff Johnson, through an entity called Real Estate Investment Pros LLC ("REIP"), from approximately March 2002 to May 2003. See Ex. 2, pp. 17-19; Ex. 3, p. 51.

The Chins' career in real estate was spectacular, but ultimately unsuccessful. Between December 2001 and February 2003, the Chins bought a total of 38 properties. See Ex. 1. During the period from approximately December 24, 2001, through February 20, 2003, Mr. Chin, Mrs. Chin or both made an approximate total of 46 loan applications and borrowed approximately $10,538,750, secured by their real estate purchases. See Ex. 1, p. 2; Ex. 6.

The Chins' real estate acquisitions followed a pattern: Mr. Johnson or Mr. Brigham would locate the properties to be purchased. Each property would be purchased initially by US Financial or REIP, as the case may be, and Mr. Chin, Mrs. Chin or both would buy the property from US Financial or REIP at a greater purchase price. The transactions would close simultaneously in a double escrow. Mr. Chin initially, and later Mrs. Chin, because

Page 3 - MEMORANDUM OPINION

Mr. Chin's credit was "getting bad," would borrow personally to fund the real estate purchases. US Financial or REIP would receive a distribution from escrow that represented "profit," according to Mr. Chin. Mr. Johnson, from US Financial, and Mr. Brigham, from REIP, would take their profits up front and not return any money to the entities.

From approximately April 2002, Mrs. Chin did the bookkeeping for REIP, using a Quickbooks ledger that she maintained on her home computer. The parties are agreed that substantial sums received by the Chins from the escrows and from US Financial and REIP were used to fund loan repayments and repairs/renovations to the purchased properties. According to the Chins, the idea behind both US Financial and REIP was to acquire properties to rehab and sell at a profit. However, the Chins admitted during their testimony that some of the money they received was used to pay their personal expenses.

During the time that the Chins owned real estate investment properties, the properties generated rents totaling $388,922 deposited in REIP accounts. See Ex. 10. However, according to Mr. Chin, the real estate investment business grew too fast, with neither adequate capital nor sufficient income to complete the work required on most of the properties to allow for profitable resale. Mr. Chin testified that he was not really sure but thought that two or three of the properties were sold, with the rest being lost through foreclosure or "short sale." By the end of 2002, the real estate investment business was in trouble, and title to most of the

Page 4 - MEMORANDUM OPINION

properties was transferred to Mrs. Chin in January 2003. Such
transfers were C.J. Brigham's idea, according to Mr. Chin, to give
the Chins more time to get new loans or negotiate new payment
arrangements with lenders, in order to keep the properties. The
Chins' maneuvering was unavailing, and they filed their chapter 7
petition in September 2003, on the eve of entry of a substantial
default judgment against them.

In their Statement of Financial Affairs ("SOFA") filed with
their bankruptcy petition, in their response to Item 1, the Chins
listed their gross income for the last three years as follows:
2001-$34,384 from Lucky Produce, Inc.; 2002-$9,000 from Lucky
Produce, Inc.; and 2003-$3,000 from T.P. Produce, Inc. The Chins
did not disclose any income from rents or otherwise with respect to
US Financial or REIP for any of those years. See Ex. 3, p. 41. In
their SOFA, in their response to Item 19d., the Chins responded
"None" to the request to list financial institutions or other
parties to whom the Chins had issued financial statements during the
two years immediately preceding their bankruptcy filing. At their
Section 341(a) meeting, the Chins and their counsel advised the
trustee that their response to Item 19d. to the SOFA was incorrect
and apparently provided to the trustee a list of individuals and/or
financial institutions to which financial statements were given.
See Ex. 2, p. 9. However, counsel for the Chins also stated at
their 341(a) meeting that the Chins' schedules and SOFA would be
amended. See Ex. 2, pp. 6 and 9. Thereafter, the Chins never
amended their bankruptcy schedules or SOFA.

Page 5 - MEMORANDUM OPINION

On or about February 27, 2004, the UST filed the Complaint in the Adversary Proceeding and the Motion to Dismiss, based essentially on the inaccurate responses stated by the Chins in Items 1 and 19d. of their SOFA.

## Generally Applicable Legal Standards

A primary objective of the Bankruptcy Code is to provide a fresh start to debtors overburdened by debts they cannot pay. Consistent with that social welfare objective, I start from the proposition that the denial of discharge provisions of the Bankruptcy Code are interpreted strictly in favor of debtors. "A denial of a discharge is an act of mammoth proportions, and must not be taken lightly. In light of this gravity, this Court and many others have stated that Section 727 must be construed liberally in favor of the debtor and against the objector." In re Goldstein, 66 B.R. 909, 917 (Bankr. W.D. Pa. 1986). See In re Adeeb, 787 F.2d 1339, 1342 (9th Cir. 1986); and In re Devers, 759 F.2d 751, 754 (9th Cir. 1985).

Nevertheless, the opportunities for a new beginning afforded by the Bankruptcy Code are limited to the "honest but unfortunate debtor." See Cohen v. De La Cruz, 523 U.S. 213, 217 (1998) (citing Grogan v. Garner, 498 U.S. 279, 286-87 (1990)). The dishonest debtor, however unfortunate, does not get the benefit of a discharge in bankruptcy.

The party seeking to prevent a debtor's discharge bears the burden of proof. See In re Johnson, 68 B.R. 193, 198 (Bankr. D. Or. 1986). Since the United States Supreme Court's decision in Grogan

Page 6 - MEMORANDUM OPINION

v. Garner, the burden of proof standard for actions to deny the debtor a discharge under Section 727 is preponderance of the evidence. See In re Hoblitzell, 223 B.R. 211, 215 (Bankr. E.D. Ca. 1998); and Garcia v. Coombs, 193 B.R. 557, 560 (Bankr. S.D. Ca. 1996). In addition, once the complaining party has presented a prima facie case for denial of the debtor's discharge, the burden shifts to the debtor to offer a credible justification in defense. See, e.g., In re Devers, 759 F.2d at 754 ("While the burden of persuasion rests at all times on the creditor objecting to the discharge, it is axiomatic that the debtor cannot prevail if he fails to offer credible evidence after the creditor makes a prima facie case."); Chalik v. Moorefield, 748 F.2d 616, 619 (11th Cir. 1984); and Montey Corp. v. Maletta, 159 B.R. 108, 112 (Bankr. D. Conn. 1993) ("Where persuasive evidence of a false statement under oath has been produced by a plaintiff, the burden shifts to the defendant to prove that it was not intentionally false [citations omitted] and fraudulent intent may be inferred, if the false statement is not explained.").

An essential element required to deny a debtor a discharge under many of the subsections of Section 727(a), including Section 727(a)(4), is fraudulent intent. Recognizing the reality that few debtors are likely to break down and confess to fraud on the witness stand, fraudulent intent may be established through circumstantial evidence or evidence of a pattern of conduct consistent with the misconduct alleged. See, e.g., In re Adeeb, 787 F.2d at 1343; In re Devers, 759 F.2d at 754; and In re Johnson, 68 B.R. at 198.

Page 7 - MEMORANDUM OPINION

1  　　　The foregoing general principles govern the following
2  analysis of the specific cause of action asserted in the Adversary
3  Proceeding and the evidence presented.

4  <u>727(a)(4)</u>

5  　　　Section 727(a)(4)(A) denies a discharge to a debtor who
6  knowingly gives a false oath or account in connection with his or
7  her bankruptcy case.　"Section 727(a)(4)(A) requires the denial of a
8  discharge if: (1) the debtor knowingly and fraudulently made a false
9  oath; and (2) the false oath related to a material fact."　<u>In re</u>
10 <u>Ford</u>, 159 B.R. 590, 593 (Bankr. D. Or. 1993), citing <u>In re Aubry</u>,
11 111 B.R. 268, 274 (9ᵗʰ Cir. BAP 1990).

12 　　　In this context, "materiality" is interpreted broadly.　To
13 justify denying a discharge to a debtor, the false oath must relate
14 to a fact or facts important to an understanding of the debtor's
15 financial or business affairs, or assets or liabilities.　"A false
16 statement is material if it bears a relationship to the debtor's
17 business transactions or estate, or concerns the discovery of
18 assets, business dealings, or the existence and disposition of the
19 debtor's property."　<u>In re Wills</u>, 243 B.R. 58, 62 (9ᵗʰ Cir. BAP
20 1999).

21 　　　As noted above, the element of a false oath made with knowing
22 and fraudulent intent may be established by circumstantial evidence
23 and/or evidence of a pattern of conduct representing "a reckless
24 indifference to truth equivalent to fraud."　<u>Boroff v. Tully</u>, 818
25 F.2d 106, 108, 112 (1ˢᵗ Cir. 1987).　<u>See also</u> <u>Hatton v. Spencer</u>, 204
26 B.R. 477, 484 (E.D. Va. 1997).　However, it is important not to lose

Page 8 - MEMORANDUM OPINION

1  sight of the requirement under § 727(a)(4) that the complaining

2  party has the burden of proof to establish that the debtor defendant

3  acted with <u>actual</u> intent to defraud.

> The essential point is that there must be something
> about the adduced facts and circumstances which
> suggest[s] that the debtor intended to defraud
> creditors or the estate.  For instance, multiple
> omissions of material assets or information may well
> support an inference of fraud if the nature of the
> assets or transactions suggests that the debtor was
> aware of them at the time of preparing the schedules
> <u>and that there was something about the assets or
> transactions which, because of their size or nature, a
> debtor might want to conceal</u>....<u>In other words, is
> there something about the omitted asset or transaction
> which a debtor might want to avoid disclosing.</u>

11  <u>Garcia v. Coombs</u>, 193 B.R. at 565. [Emphasis added.]

12  A.   The UST's Case.

13  Mr. Chin testified on direct examination by the UST that the

14  Lucky Produce business grossed approximately $50,000 in 2001 and

15  $9,000 in 2002.  While it is unclear from the record why the Chins

16  included the entire gross income for Lucky Produce in 2002 but only

17  a portion of its gross income for 2001 in their response to Item 1

18  on their SOFA, I find that the difference in reporting 2001 gross

19  income for Lucky Produce on the Chins' SOFA is immaterial.

20  Ms. Tammy Combs, the UST's accountant/financial analyst,

21  testified regarding her investigation of the Chins' financial

22  affairs, including review of the Chins' real estate investment

23  activities in conjunction with US Financial and REIP.  Ms. Combs

24  reviewed the Chins' personal bank statements and account information

25  and various loan applications signed and submitted by the Chins to

26  potential lenders.  In addition, Ms. Combs printed out and reviewed

Page 9 - MEMORANDUM OPINION

the information contained on the backup disc for the REIP Quickbooks ledger that the Chins delivered to the trustee at their 341(a) meeting, and reviewed REIP bank account information and documentation. See Ex. 9.

Based upon Ms. Combs' review and analysis, she testified that a total of $1,815,522.45, including $388,922 in rental income, was deposited into REIP bank accounts. See Ex. 10. From those deposits, approximately $1,604,086 apparently was disbursed directly to pay real estate investment related expenses. See Ex. 35. Ms. Combs testified that $120,806.70 in checks were written on the REIP bank accounts and deposited into the Chins' personal bank accounts. See Ex. 5, p. 16. Ms. Combs further testified, that giving the benefit of the doubt to the Chins, it appears that $90,628.55 of personal expenses of the Chins were paid directly with disbursements from the REIP accounts. See Ex. 5, pp. 5-15.

Looking at the Chins' personal bank accounts for the period December 2001 through October 14, 2003, the Chins deposited a total of $318,663.19 into their personal bank accounts from (a) REIP account disbursements, (b) escrow proceeds from real estate investment related loan transactions, and (c) all other sources. See Ex. 8, particularly pp. 1-3. Ms. Combs testified that the Chins deposited $128,579.95 into their personal accounts from real property closing escrows. Reviewing the disbursements records from the Chins' personal bank accounts, and again giving the benefit of the doubt to the Chins, Ms. Combs testified that disbursements for real estate investment or unknown expenses between December 16,

2001, and May 23, 2003, totaled $139,398.53. See Ex. 11. Ms. Combs further testified that the Chins apparently spent $176,244 from their personal accounts to pay personal expenses unrelated to the real estate investment business.

In summary, based upon her review and analysis of the Chins' financial records and the real estate investment records, including the Quickbooks ledger and bank account information available for REIP, Ms. Combs testified that the Chins deposited $318,663.19 into their personal bank accounts and used approximately $266,873 to pay personal expenses during the period when they reported total gross income under penalties of perjury in their response to Item 1 in their SOFA of $46,384. See Ex. 3, p. 41; Ex. 11, p. 1.

Cross examination of Ms. Combs included review of the Chins' Exhibits A through D and L, prepared from the REIP Quickbooks ledger by Mrs. Chin, showing a total of $893,103 in disbursements for real estate business related expenses. Except for a check written for $3,500 cash by Mr. Chin, included on Exhibit C, p.36, with respect to which Ms. Combs could not determine the use (see Ex. 5, p. 4), Ms. Combs testified that she had not included any of the expenses listed in the Chins' Exhibits A through D and L in her calculation of the Chins' personal use of cash. In Exhibits A through D and L, the Chins did not include any disbursements to pay their personal expenses from REIP, even though both of the Chins admitted during their testimony at the Trial that some of their personal expenses were paid from the REIP accounts.

During the course of his direct examination for the defense,

Page 11 - MEMORANDUM OPINION

1 Mr. Chin testified that certain expenses categorized as personal by

2 Ms. Combs at pages 5-14 of Exhibit 5 actually covered business

3 expenses of Lucky Produce and the Chins' real estate enterprises,

4 including the following:  Bank of America (credit card), Capital One

5 Services (credit card), $5,000 cash ($1,800 to counsel,

6 Mr. Schaller, and $3,200 to C.J. Brigham), $2,704 cash (to pay for

7 appraisal services), $2,000 (to pay for title services), Home Depot,

8 Lucky Produce ($10,000 loan), Sears, US Bank (credit card), and

9 Wells Fargo (to open account).[2]

10 　　　In her direct testimony for the defense, Mrs. Chin testified

11 that she agreed with Mr. Chin's characterizations of certain of the

12 "personal expenses" listed in Pages 5-14 of Exhibit 5 as in reality

13 business expenses.  In addition, she noted that $2,704 of cash

14 expenditures and customer withdrawals on pages 6-7 of Exhibit 5 were

15 duplicate entries.

16 　　　Accepting the Chins' testimony regarding what constituted

17 "business" as opposed to "personal" expenses in the UST's Exhibit 5

18 categorizations at face value[3], and adding the $3,500 check written

19 by Mr. Chin to "cash" on June 27, 2002, included on Exhibit C, a

20 total of $56,860.62 would need to be deducted from Ms. Combs'

21

22 　　　[2]  Ms. Combs previously testified that she assumed most credit
card charges did not represent business expenses because the Chins'
23 tended to write checks to cover their business expenses.

24 　　　[3]  I have not deducted $10,255 in payments to Hubert Chin to
repay a loan(s), to make a loan and to pay $80 for computer hookup
charges, as testified to of by Mr. Chin.  Nothing in Mr. Chin's
25 testimony connects any of those payments to the Lucky Produce
business or the Chins' real estate investment business.
26

Page 12 - MEMORANDUM OPINION

estimate of $266,873 in personal expenditures.  However, after
deducting that total, the Chins still spent approximately
$210,012.38 for personal expenses during the period when they
reported total gross income of $46,384 in their response to Item 1
on their SOFA.

The Chins did not include any of the $388,922 in rental
income from their investment properties in their report of gross
income in response to Item 1 in their SOFA.  Counsel for the Chins
argued that excluding the Chins' rental income from their SOFA
disclosures was appropriate because any rental income received was
offset by expenditures for the investment properties.  However, the
Chins were not so fastidious with respect to the income information
they included in financial statements presented to lenders.

From February 15, 2002, through November 19, 2002, one or the
other of the Chins, or both, presented approximately 46 loan
applications including personal financial statements to potential
lenders.  See Ex. 6.  In the 31 loan applications presented by
Mr. Chin individually, he stated his monthly gross income as $12,000
in one application, $18,000 in one application, $25,000 in 28
applications, and $37,000 in one application.  See Ex. 6 and Ex. 7,
pp. 1-9.  In his loan applications, Mr. Chin stated his monthly
gross rental income as ranging from a low of $1,200 to a high of
$57,050.  See Ex. 6. In the 12 loan applications presented by
Mrs. Chin individually, she reported her monthly gross income in a
range from $6,500 to $18,475.  See Ex. 6 and Ex. 7, pp. 10-28.  She
reported monthly gross rental income ranging from $0 to $22,495.

Page 13 - MEMORANDUM OPINION

See Ex. 6.   In two of the three loan applications presented jointly by the Chins, they stated their monthly gross income was $25,000. See Ex. 6, p. 1.   In both of those applications, the Chins reported their monthly gross rental income as $7,900.  See Ex. 6, p. 1.

Mr. Chin admitted during direct examination by the UST that he never earned wages of either $12,000 or $25,000 a month, although he argued that he might have had rental income in such amounts. Mrs. Chin likewise admitted during cross-examination by the UST that she never earned $10,500, $18,000 or $25,000 a month, either individually or jointly with her husband.

Both Mr. and Mrs. Chin testified that C.J. Brigham prepared the Exhibit 6 financial statements that they signed.  Mr. Chin testified that he noticed an error in listing a 2002 Mercedes that Mr. Chin did not own on a financial statement that he signed, but Mr. Brigham told him not to worry because he would take care of it later.  See Ex. 7, p. 2.  Mrs. Chin testified that she brought problems in the financial statements that she and her husband signed, such as listing them as single or unmarried and including inaccurate income information, to Mr. Brigham's attention from the beginning when she started signing financial statements in April 2002.

I find the Chins' attempts to lay all of the inaccuracies in the income information included in their financial statements at the doorstep of Mr. Brigham not credible in light of the fact that the Chins apparently kept signing multiple, clearly inaccurate financial statements over a period of at least ten months, without ever making

Page 14 - MEMORANDUM OPINION

any effort to correct the misinformation that was being communicated
to their lenders. In particular, Mrs. Chin testified that she
recognized the inaccuracy of the income information included in the
first financial statements that Mr. Brigham prepared for her to
sign. Yet, when confronted with inaccurate income information in a
financial statement that she signed four months later, her first
reaction was to lie and testify that she did not recall whether her
gross income was $10,500 per month, before admitting that she never
made that much.

The evidence presented by the UST tends to establish that the
Chins engaged in a pattern of misrepresenting their income in
financial statements during the heady period of their participation
in the real estate game, that the UST goes on to argue was carried
over into misrepresentations of their income in their response to
Item 1 in their SOFA.

The UST argued that the discrepancies between the Chins'
actual income and the income reported in response to Item 1 of their
SOFA were material to an appropriate examination of the Chins'
financial affairs. I agree, and I find that the UST presented a
sufficient prima facie case to establish that the Chins knowingly
and fraudulently made a false oath when they signed off on
inaccurate income information in their SOFA.

B. <u>The Case for the Defense</u>.

The Chins raised a number of defenses to the UST's claims.
First, while the Chins testified that they read their bankruptcy
schedules and SOFA before signing them and thought they were

Case 04-03066-rld    Doc 32-1    Filed 12/17/04

accurate, Mr. Chin testified that the Chins were under the stress of a deadline to file their bankruptcy petition before a default judgment could be taken against them. He testified that he just "skimmed" the schedules and SOFA and later recognized that they contained errors. He further testified that errors were brought to the attention of the trustee at the Chins' 341(a) meeting.

At the outset, this court does not take lightly the obligations of debtors to list their assets and liabilities and give a report of their affairs accurately in their bankruptcy schedules and statements of financial affairs under penalties of perjury.

> ...[T]he very purpose of certain sections of the law, like 11 U.S.C. § 727(a)(4)(A), is to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs. The statutes are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction.

Boroff v. Tully, 818 F.2d at 110.

The fact alone that a debtor, through ignorance or otherwise, takes a casual approach to the process of preparing and signing his or her bankruptcy schedules and statement of financial affairs may not be dispositive to establish that the debtor knowingly and fraudulently made a false oath. However, if such schedules and/or statements of financial affairs prove to be materially inaccurate, evidence of such inaccuracies may establish such reckless disregard for the truth or fit within a pattern of providing false information, as to justify denying a discharge to the debtor. See, e.g., Hatton v. Spencer, 204 B.R. 477 (E.D. Va. 1997); and Mosley v.

Page 16 – MEMORANDUM OPINION

1  <u>Sims</u>, 148 B.R. 553, 557 (Bankr. E.D. Ark. 1992) ("...Willie Sims

2  asserts that he merely 'glanced over' the petition but 'didn't

3  really understand it.'  However, the Bankruptcy Code requires more

4  than a 'glance over' in reporting assets and transactions.  Indeed,

5  a mere 'glance over' constitutes a cavalier and reckless disregard

6  for truth which is inconsistent with the relief to be afforded the

7  honest debtor.").

8        In this case, based upon the foregoing review of evidence

9  submitted by the UST, there is substantial evidence that the Chins

10  under-reported their income in their response to Item 1 in their

11  SOFA.  In addition, the Chins reported "None," in response to the

12  request in Item 19d. of their SOFA to list parties to whom the Chins

13  had issued financial statements during the two years preceding their

14  bankruptcy filing.  At their 341(a) meeting, counsel for the Chins

15  apparently delivered to the trustee a list of parties to whom the

16  Chins had given financial statements.  However, despite a commitment

17  to the contrary by counsel for the Chins at their 341(a) meeting,

18  the Chins never amended their schedules or SOFA.  Accordingly, the

19  Chins never amended their report of gross income in their response

20  to Item 1 in their SOFA, and there is nothing in the evidentiary

21  record to establish what the Item 19d. list delivered to the trustee

22  contained.  If Exhibit 6, with its listing of 46 loan applications

23  with financial statements, is any indication, the list must have

24  been lengthy.  Yet, it was delivered in the context of the following

25  statement by Mr. Chin in response to the trustee's question: "To the

26  best of your knowledge is the information contained in the

Page 17 - MEMORANDUM OPINION

petitions, schedules, statements and related documents true and correct?"  Mr. Chin: "Some of it was just a little bit off."  Ex. 2, p. 5.

Whether or not the income information included in their SOFA was inaccurate, the Chins further argue that any income, including rental income, generated by their real estate investment ventures was offset by expenses for the properties.  Consequently, in the Chins' view, such income did not need to be reported in their response to Item 1 in their SOFA, in spite of the fact that the Item 1 request for information refers to "gross income."  See Ex. 3, p. 41.  The Chins also contend that money received from their real estate investment enterprises was not income because it consisted of loan proceeds.

There is a line of authority, as cited by counsel for the Chins in argument at the Trial, to the effect that loan proceeds generally are not included in gross income for tax purposes.  See, e.g., Oliver v. United States, 193 F. Supp. 930, 934 (E.D. Ark. 1961); Stayton v. Commissioner, 32 B.T.A. 940 (1935); and Dilks v. Commissioner, 15 B.T.A. 1294 (1929), aff'd, 69 F.2d 1002 (7th Cir. 1934.)

However, even within the line of authority cited by counsel for the Chins, the Supreme Court has characterized income as including "undeniable accessions to wealth, clearly realized, and over which the taxpayers have complete dominion."  Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955).  See also Eisner v. Macomber, 252 U.S. 189, 206-07 (1920).  The definition of "gross

Page 18 - MEMORANDUM OPINION

income" in the Internal Revenue Code of 1986, as amended,
specifically includes "rents" as an example. See 26 U.S.C.
§ 61(a)(5).

In bankruptcy, the concept of "income" or "gross income" is
flexible. "The term 'gross income' should not convey the same
definite and inflexible significance under all circumstances and
wherever used. It is a term whose construction and meaning depends
on the context of the subject matter." Shelley v. Kendall, 184 B.R.
356, 359 (9th Cir. BAP 1995), aff'd, 109 F.3d 639 (9th Cir. 1997).

The factual evidence presented at the Trial tends to vitiate
the effectiveness of the Chins' legal arguments that funds they
received from their real estate investments should not be considered
income. On direct examination by the UST, Mr. Chin testified with
regard to a number of specific transactions that funds paid to REIP
from the double closings represented profits. He further testified
that Jeff Johnson and C.J. Brigham took their profits from the US
Financial and REIP transactions up front and paid nothing for
maintenance, improvements or service of indebtedness with respect to
any of the investment properties. See Ex. 2, pp. 16, 18-19, 100-01.
Mr. Johnson and Mr. Brigham clearly realized "income" out of the
loan proceeds generated in relation to the real estate investment
transactions.

The UST established through admitted exhibits and the
testimony of Ms. Combs, as clarified by the testimony of Mr. and
Mrs. Chin, that the Chins paid personal expenses that exceeded the
income they reported in their response to Item 1 in their SOFA by a

Page 19 - MEMORANDUM OPINION

range of from $150,000 to $200,000 for the subject time period. By paying those personal bills, the Chins exercised "complete dominion" over those funds and effectively realized income.

A primary source of information regarding the Chins' receipt of funds and their payment of personal expenses was their personal bank account records. See Exs. 5 and 8. Bank deposits can be considered as evidence of income in appropriate circumstances. See Mills v. Commissioner, 399 F.2d 744, 749 (4th Cir. 1968)("In the absence of records kept by the taxpayer showing the source of his cash receipts the Commissioner may look to other sources of information to establish income, and may take into account, as prima facie evidence of income, bank deposits made by the taxpayer during the years in question." [Emphasis added.]). See also Ruark v. Commissioner, 449 F.2d 311 (9th Cir. 1971).

I have found that the UST presented sufficient evidence to establish a prima facie case that the Chins' substantially understated their gross income in their response to Item 1 in their SOFA. If the Chins intended to rely on a technical "tax" definition of income to defend against the UST's case, the best evidence to support their position probably would include copies of their federal income tax returns filed for the years 2001, 2002, and 2003. However, the Chins did not submit their tax returns for those years as exhibits.

Based on the foregoing review of the evidence, I find that the Chins substantially under-reported their gross income for 2001, 2002, and 2003 in their response to Item 1 in their SOFA. I further

Page 20 - MEMORANDUM OPINION

1  find that an accurate statement of their income for the periods in

2  question was material to an understanding of their prepetition

3  financial affairs, particularly regarding their real estate

4  investing activities.

5  C.  Knowing and Fraudulent.

6  Based on the evidentiary record, I find that the Chins were

7  substantially inaccurate in stating their gross income in their

8  response to Item 1 in their SOFA.  Their disregard for the truth in

9  disclosing income is consistent with the pattern of grossly

10  inaccurate statements as to their income included in the many

11  financial statements delivered to potential lenders in 2002.  See

12  Ex. 6.  However, with the Garcia v. Coombs standard in mind, the

13  evidence in this case further presents a compelling motive for

14  knowing nondisclosure.

15  I find that the real estate investment enterprises conducted

16  in the names of US Financial and REIP were real estate scams.  The

17  Chins apparently were used by Jeff Johnson and C.J. Brigham as front

18  people to extract money from transactions with a surface legitimacy.

19  The Chins assumed all of the liabilities as ultimate borrowers in

20  the US Financial and REIP real estate purchases, and they were left

21  holding the bag when real estate prices and rents did not rise fast

22  enough to compensate for the inadequate capitalization of their

23  enterprises.  However, the Chins were in too deep and stayed in too

24  long to play the roles of innocent dupes credibly.  After all, the

25  Chins began signing off on financial statements that they knew were

26  materially incorrect in early 2002 and continued to put their

Page 21 - MEMORANDUM OPINION

signatures and initials on dozens of such financial statements
through November 2002.  <u>See</u> Ex. 6.  In addition, Mrs. Chin began
doing the bookkeeping for REIP in April 2002 and continued keeping
the REIP accounts through the end in May 2003, making decisions
about disbursements of REIP funds with Mr. Chin and C.J. Brigham.

I find that the Chins had and have an interest in keeping the
records of US Financial and REIP transactions obscure, particularly
with respect to disbursements made to pay the Chins' personal
expenses.  I understand and do not discount from the evidence
presented that the Chins made very large expense payments with
respect to their real estate investments from REIP and from their
personal accounts.  However, I find that the Chins appropriated
substantial sums in excess of their income from Lucky Produce and TP
Produce from the REIP and US Financial transactions to fund their
personal expenses.  I further find that the Chins did not include
such substantial sums in their reported gross income in their
response to Item 1 in their SOFA and that they knowingly and
fraudulently failed to report said income.  Accordingly, I find that
the UST has met the burden of proof required to deny the Chins a
discharge pursuant to Section 727(a)(4)(A) in their chapter 7 case.
Since the denial of discharge remedy provides all the relief that
the UST otherwise seeks through the Motion to Dismiss, I do not need
to decide the Motion to Dismiss, and I decline to do so.

Conclusion

In summary, I find in favor of the UST on her cause of action
to deny a discharge to the Chins pursuant to Section 727(a)(4)(A) of

Page 22 - MEMORANDUM OPINION

1 the Bankruptcy Code.  Counsel for the UST should submit a form of

2 judgment consistent with this Memorandum Opinion.

3

4                                    _Randall L. Dunn_
                                     RANDALL L. DUNN
5                                    Bankruptcy Judge

6

7 cc:    M. Vivienne Popperl
        James R. Schaller
8       Michael B. Batlan, Trustee

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Page 23 - MEMORANDUM OPINION